PER CURIAM.
—From the appeal book it would seem that the defendants sought to prepare a bill of exceptions upon which to obtain a review of the decision made at special term. However, it appears that considerable portions of the evidence given at the trial are inserted in the appeal book, Findings of fact were made which are very full and elaborate, and upon looking into the evidence found in the appeal book it is quite apparent that the evidence, though conflicting, fully sustains the finclings of fact made by the trial judge. He delivered an opinion which extensively considers all the essential questions of law which arose during the progress of the trial, and which form the basis for the conclusion which he reached, and the opinion is satisfactory upon the essential questions of law involved in the case, and renders it unnecessary that a further discussion should be had of the facts or of the law involved in the case. Southard v. Curley, 134, N. Y. 148; 45 St. Rep. 778; Allison Bros. Co. v. Allison, 63 St. Rep. 1.
Judgment affirmed, with costs.
The opinion of Mr. Justice WILLIAMS at special term Is as follows:
At the time of the negotiations at Smith’s Lake, June 15 and 16, 1891, Webb had purchased and made provision for obtaining title to all the lands surrounding the lake, excepting these two lots six and seven; and he was desirous of purchasing and secur *722 ing title to these two lots, so that he might have the exclusive control oE the lake and all the lands surrounding it. He supposed Morrison was the owner of these lands, or had such an interest therein, as that a purchase of all his interest in the two lots would enable him (Webb) to obtain a title thereto and the whole thereof. Morrison understood what Webb desired, and what he supposed as to his (Morrison’s) interest in the lands; and I must find that the negotiations at Smith’s Lake were understood to extend to Morrison’s whole interest in the whole of the two lots, and that both of them understood the purchase was to be of such interest for the sum of $15,000. I do not deem it necessary to refer in detail to the evidence given on this trial bearing upon these questions of fact, or to make any arrangement with reference thereto. The evidence is voluminous. I listened carefully to the whole of it, and have considered it all, and I entertain no doubt as to the conclusions I have here stated.
There was concgdedly a writing dralvn up by and signed by the parties at the close of the negotiations, which expressed the understanding arrived at, but was not a very formal paper; and a more formal contract, to be prepared and executed in Mew York City, was in the contemplation of the parties when they left Smith’s Lake on that occasion. Whether that writing made at Smith’s Lake was understood to be a full, complete agreement or not may not be so very material There was talk about a so-called clubliaving an interest in the property, and it may well be that Morrison desired to consult with the members of that club, and have-their consent, before making a more formal contract. There is no claim made however, that such club, or its members, had any interest in the property in question in this action. Their interest appears to have extended to no part of the two lots beyond the fifty acres. Whether the writing made at Smith’s Lake be regarded as a perfect contract or only a memorandum of what the contract to be executed should be, I have no doubt it expressed, and the parties understood, that the $15,000 consideration was to be paid for nothing less than all the interest Morrison had in the whole of the two lots six and seven, of 416 acres. It is said now that Morrison had no interest whatever at that time in the two lots beyond the fifty acres,' and that the interest which he after-wards claimed in the balance of the two lots, and a part of which he transferred to Richardson, was obtained by him after the contract of June 24, 1891, was made. This claim leads me to consider the question of Morrison’s interest in the lands in question, the balance of the lots beyond the fifty acres, and the time when such interest was acquired by him. During the year 1881, and prior thereto, the Edwardses were in occupancy of these two lots. It does not appear whether they had any real title thereto. Ycry likely they had not, but they occupied the same. In 1881 the two lots were sold for taxes, and. bid in for the state; but after such sale notices to redeem- were served upon such occupants, as required by statute. Tire Edwards remained in the occupancy of the lots until about the year 1885, and in the meantime a deed of the lots under the laws of 1881 *723 was given to the state. In 1885,Morrison and others paid tb e Edw ards $2,000, took a bill of sale of such property as they had upon the lots, and the Edwards surrendered possession and occupany of the lots to Morrison and others, who thereafter, by themselves or their agent, continued to occupy the same. After this change in the occupation, and in 1885, the lots were again sold for taxes, and bid in for the state; and after this sale notices to redeem were served upon the occupants of the lots, as required by statute. Morrison continued his occupancy of the lots until 1890, and in the meantime a deed was given the state of the lots under the sale of 1885. In 1890, Morrison made efforts to secure title to the two lots. A petition was made by him, having date May 31, 1890, addressed to the forestry commission, wherein he stated that he was the owner of the buildings and appurtenances near the shore of Smith’s Lake, upon lots 6 and 7, which buildings, etc., had been in use as an hotel and residence by him and others since 1875 ; that the lots had been sold for taxes in 1881 and 1885, and purchased by the state on such sales, with 2,160 acres of other lands in township 38 ; that all of the lands were so purchased in a single lot or bunch, although lots 6 and 7 did not lie contiguous to the other lands; that all the lands had been deeded to the state in a bunch, and notices to redeem had been served upon the occupants, pursuant to statute, December 29, 1889, and time to redeem would expire about June 23, 1890 ; and herein he submitted two proposals. The first was that he and all persons upon whom notices to redeem had been served waive their right to redeem all the lands sold in the bunch, except lots 6 and 7, and the comptroller, with the recommendation of the forestry commission and the advice of the attorney general, sell and convey to him lots 6 and 7 for such reasonable price as might be agreed on, and thereupon he should reconvey to the state all of lots 6 and 7', excepting the fity acres. The second proposal was to exchange some other lands for lots 6 and 7. The forestry commission, under date of June 18, 1890, recommended the acceptance of the first proposition, to sell lots 6 and 7 to Morrison upon his reconveying to the state all but the fifty acres, and paying $250 ; Morrison having, June 5, 1890, procured a deed from the Edwardses of all their interest in the lots. So far as the papers show, nothing further was done under this proceeding during the year 1890 ; but on the next day after the forestry commission had made their recommendation, and June 19, 1890, Morrison entered into an agreement in writing with Mrs. Marsh, who claimed the other lands sold with lots 6 and 7 in one bunch, that she should redeem all the lands from the sale of 1885, she to furnish two-thirds and Morrison one-third of the amount required for such redemption; and that she should make all proper efforts to have the sale of 1881, and the deeds thereunder, set aside and canceled by the comptroller before the next sale of said lands, to be made during that year 1880 ; and that, in ease of her inability to procure such action by .the comptroller, she should redeem all the lands from the sale of 1881, she to furnish two-thirds and he one-third of the amount required for such redemption; that she should then *724 purchase all the lands at the sale in 1890, and assign the certificate to him, so far as lots 6 and 7 were concerned, upon his paying her the amount necessarily bid therefor. There were other provisions in the agreement, which need not be stated here. Mrs. Marsh did accordingly redeem all the lands from the sale of 1885, and made an application to the comptroller for the cancellation of the sale of 1881, and the deed thereunder. The comptroller, however, refused to hear and determine the matter until after the sale of 1890, promising, however, to hear and determine it after such sale should have taken place, and that he would bid in all the lands for the state at that sale, and, if the application should finally be granted, he would assign to her the certificate of sale of such lands under the sale of 1890 upon payment of the amounts necessarily bid therefor upon that sale. The sale took place December 23, 1890, and all the lands were bid in for, and a certificate issued to, the state. This brings the transaction down to Jan nary, 1891. Morrison was cognizant of all the proceedings by Mrs. Marsh under the contract with him. The "comptroller did not render his decision upon Mrs. Marsh’s application until in August, 1891. January 6, 1891, Morrison, again resuming his efforts to secure title under his application to the forestry commission of May, 1890, procured the advice of the attorney general that the land be sold, as recommended, by the forestry commission ; and then, on the 12th of January, 1891, executed to the state a waiver of his rights to redeem from the sale of 1881, paid the state $250, took from the state a deed of the whole of lots 6 and 7 and gave back to the state a deed of all of said lots excepting the fifty acres. Nothing further was done about perfecting title to the whole lots until after the negotiations between these parties, Webb and Morrison, the making of the contract of June 24, 1891, and the giving of the deed in July, 1891. Thereafter, and on August 14, 1891, the comptroller granted the application, regarding it as an application to redeem from the sale of 1881; and August 14, 1891, upon receipt of amount necessary to redeem, assigned the certificate of the 1890 sale to Mrs. Marsh. She called upon Morrison for his one-third of the amount necessarily paid under their contract; and Morrison, August 25, 1891, paid her his one-third of such amount, being the sum of $796.44, and she assigned the certificate to him so far as lots 6 and 7 were concerned, and executed to him a quit-claim of said lots. The interest of Mrs. Marsh in the other lands had been sold to Webb, and he received Mrs. Marsh’s interest therein. Morrison refused to surrender to Webb his interest in lots 6 and 7 beyond the fifty acres.
I have examined the suggestions of counsel with reference to this question of Morrison’s interest in lots 6 and 7 beyond the 50 acres in June and July, 1891, with considerable care and interest and some curiosity. Morrison occupied a somewhat peculiar position. He claims he had no interest in the disputed property in June or July, 1891, under the Mrs. Marsh contract, and yet he is here in this action with no other claim of right or title or interest in the property except such as has grown entirely ont of that con *725 tract, and he has asked Webb to pay him $10,000 for this same interest It is somewhat difficult to comprehend precisely what his rights -and interests were under the Mrs. Marsh contract in June and July, 1891, and yet more difficult to understand, if he had none then, how he has any now upon which to base his defense to this action. Let me see if I can draw any satisfactory conclusion from the evidence as to this question of interest. If the lands sold in 1881 had been unoccupied at the expiration of the two years from the sale, the time allowed for redemption, then the right to redeem would have been gone at the end of the two years, end the title of the state would have been absolute. The lands, however, were occupied at the expiration of the two years, —a part of them, lots 6 and 7,—and therefore the time to redeem could not be limited except by the service of a notice upon the occupant under the statute. No such notice was ever served, and therefore in 1890 the right to redeem from the sale of 1881 still existed. It was necessary, however, to apply for such right to the comptroller, and to establish the fact of occupancy at the time fixed by the statute. This was done by Mrs. Marsh. She had redeemed from the,sale of 1885. She could not bid under the sale of 1890 until redemption under both sales, 1881 and 1885. The comptroller was busy, and did not want to pass upon ¡ the application until after the sale of 1890 had taken place. Therefore he made the agreement that, inasmuch as only the state could bid on the property so long as the sale of 1881 remained unredeemed if the right to redeem should finally be established, Mrs. Marsh shall have the same standing as though the application had been passed upon promptly before the sale of 1890. Now, this was an agreement binding upon the state, and that would have been enforced if not caaried out, I apprehend. It was existing in January, 1891, when the state, through the same comptroller, dealt with Morrison as to these two lots 6 and 7 and the fifty acres. The comptroller had not yet examined and passed upon Mrs. Marsh’s application. All the title the state had to deal with Morrison upon as to these lots and the 50 acres was the title under the sale of 1881, supplemented by rights acquired under the sale of 1890; and that title was liable to fail by the success of the application of Mi's. Marsh, which would enable her to redeem from the sale of 1881, and then to have all the rights of the state under the sale of 1890. As to this whole application, the state was dealing with Mrs. Marsh, and not with Morrison. The state could not avoid the claim of Mrs. Marsh by alleging any waiver of Morrison. The possession of Morrison’s grantor of lots 6 and 7—a part of the whole bunch of land" sold together in 1891—inured not only to the benefit of Morrison, but of Mrs. Marsh also.. Until the notice was served on the occupant, not only such occupant, but any other person, might redeem from the sale. Mrs. Marsh, therefore, had the right to' redeem all this land, including the lots 6 and 7, without Morrison’s consent; and his waiver could not and did mot affect her right to do so. This right she exercised, and having redeemed, and the state having as it agreed to do, transferred to her the certificate under the *726 sale of 1890, all title of the state under the sales of 1881 and 1890 was gone, and the transactions between Morrison and the state in January, 1891, were mere nullities, so far as the conferring of title to any part of lots 6 and 7 was concerned. Such at least was the condition of things in the absence of any rights Morrison might have under the Mrs. Marsh contract. Unless Morrison, and, if you please,Webb also, insisted upon their rights under the Mrs. Marsh contract, all their rights were gone in any part of lots 6 and 7. Morrison could and did insist upon his rights, paid his one-third of the moneys expended, and therefrom secured the certificate under the sale of 1890, so far as these lots were concerned. By Morrison’s acts in insisting on his rights and paying his money and taking the certificate, Mrs. Marsh was deprive of all her interest in these lots. The right to have this relief under bis contract Morrison had in June and July, 1891, if he had it in August 1891, when he assumed to exercise it. It may be claimed he at no time had this right after his deed in January, T891; that in equity it belonged to the state. Well, it was a right he had at law, and could hold and exercise until the state asserted its equitable right, and then the question would have to be determined. The same comptroller did all this business, both with Mrs. Marsh and Morrison, and knew all about it, except perhaps the contents of the Mrs. Marsh contract. Whether he knew about that does not appear. That will be a proper subject of inquiry in case the state attempts to assert any equitable title to the property in dispute thereunder. Fo claim has ever yet been made by the state to any interest in these lots 6 and 7 against the certificate under the sale of 1890, transferred by it to Mrs. Marsh, and by her to Morrison, Possibly none ever will be made; and until the claim is asserted and established Morrison or Webb will have and exercise such rights and interests in lots 6 and 8, beyond the 50 acres, as a holder of the certificate under the sale of 1890 is entitled to under the law. I see no reason why the court should, in this-action, attempt to settle any claim the state may have to these lots especially for the purpose of defeating any right Webb may otherwise have, so long as Morrison assumes the position he does,—that he has a great and valuable interest as against the state, which he is here seeking to withhold from Webb. He (Morrison) claims an interest. Webb claims the agreement was it should be transferred to him. If otherwise entitled-to succeed here, it seems to me the interest should go to Webb, and let him settle the question later whether the interest is valuable, or in other words, whether, as against the-state, it is of any value. I must therefore hold that Morrison had an interest in lots 6 and 7, beyond the 50 acres, at the time of the negotiations at Smith Lake in -June, 1891, at the-time of the malting of the contract of June 24, 1891, and at the time of the giving of the deed in July, 1891. The contract and deed did not cover any interest in the lots 6 and 7, of any kind, beyond the 50 acres. Webb evidently desired it to be included, and supposed it was so. Morrison know it was not included. He must have understood Webb supposed it was so included. There had been no talk of change since they left Smith’s lake. The *727 omission was one against the interest of Webb and in favor of the interest of Morrison. The contract was drawn in Mew York City by Webb’s lawyer. Webb was himself very busy with other matters. His attention was a good deal taken up, when considering the-contract at all, by talks with Morrison and some members of the so-called club about matters other than the form of contract, and especially its form as to the property described. Morrison was with Sprague when the contract was drawn, furnished the description of the 50 acres, and talked with him about the terms of the contract. The lawyer did not understand about the title, the tax sales, the Mrs. Marsh contract, or the title sought under the tax sale of 1890, with which questions Morrison was perfectly familiar. The memorandum made at Smith’s Lake was present, and I assume, stated in some general language that the $15,-000 was to be paid for all of Morrison’s interest in lots 6 and 7. The agreement describing only the thirty acres, and leaving out any language appropriate to cover the interest here in controversy, was submitted to Morrison and Webb, and both signed it. Morrison knew of the omission. I cannot believe Webb understood it. He testifies he did not; and concededly he knew all about the Mrs. Marsh contract, and that title to other lands he was interested in, as well as lots 6 and 7, was excepted to be procured and perfected under the sale of 1890 and the Mrs. Marsh contract, and had not yet been so perfected. He certainly knew the 50 acres was not all he was to have; that he was to have all the interest of Morrison in the two lots,—416 acres. I cannot believe he knew or understood the omission had been made of all interest beyond the 50 acres. I can only, conclude Morrison assured the lawyer and Webb the agreement was all right according to their previous arrangement, and that Webb signed it in that belief.
It is said in 2 Pom. Eq. Jur. § 870; “ Reformation is appropriate when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff, accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.” In Beardsley v. Duntley, 69 N. Y. 577, this remedy was applied in a case where a vendee was induced by the fraud of a vendor to accept a conveyance and pay the consideration therefor, which conveyed less land than was orally agreed to be conveyed. It was held the vendee was not bound to know what lands the description covered, and that specific performance might be had, though no improvements had been made on the lands omitted from the deed; and as to the fraud the court said: “A deduction of fraud may be made, not only from deceptive assertions and false representations directly made, but from facts, incidents, and circum *728 stances which may be trivial in themselves, but decisive evidence _of a frudulent design. The conduct of, a party which tends to conceal or suppress material facts is frequently as effective in deceiving another as actual false representations.”
This was clearly not a case of mutual mistake, but of mistake on the part of the plaintiff and fraud on the part of the defendant Morrison. The evidence is more or less conflicting as to what occurred at the time the agreement was prepared and signed. From all the evidence I conclude the fact was as I have here stated. The deed followed in form of agreement. Webb’s personal attention was not called to their form, and he seems only to have realized the form of both when Morrison, a little later, refused to surrender, the certificate under sale of 1890, and demanded $10,-000 more for the balance of lots 6 and 7. Webb had in the meantime taken possession of the lands in dispute and had made extensive improvements thereon, expending large^sums of money. It was not until some time later that Morrison and Richardson attempted to or did go upon the lands and occupy some portion thereof. Richardson clearly does not occupy the position of a bona fide purchaser, so as to give him any further protection against Webb’s claim than Morrison has. Upon the whole case it seems to me Webb is entitled to the relief asked for in-the complaint, that the contract of June 24, 1891, be reformed so as to cover and include all the interest of Morrison in the whole of lots 6 and 7, and as reformed, be specifically performed. Judgment will be ordered according. The particular form of the decision will be settled by me. Plaintiff’s counsel will prepare formal decision, and submit it to defendant’s counsel for approval as to form and to me for signature. Notice of settlement'to be given if counsel do not agree as to form. Plaintiff should have costs; and if certificate of 1890 is to be transferred to Webb he should pay Morrison the amount paid by him to Mrs. Marsh, with interest. Such requests to find as have already been submitted to the court will be formally passed upon at the time of and before signing the decision.